**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

SHIRLEY B. MOORE                                                                                PLAINTIFF

V.                                          NO. 4:07CV01157 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                              DEFENDANT

**MEMORANDUM AND ORDER**

**I.  Introduction**

Plaintiff, Shirley B. Moore, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her claim for Disability Insurance Benefits ("DIB").  Both parties have filed Appeal Briefs (docket entries #5 and #7), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108, F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g).  While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On December 16, 2004, Plaintiff filed applications for a period of disability and DIB, alleging disability since January 23, 2002, due to problems resulting from her treatment for breast cancer, depression, and anxiety. (Tr. 50-54.) After Plaintiff's claim was denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ").

On February 28, 2 007, the ALJ conducted an administrative hearing, where Plaintiff, her husband, and a vocational expert ("VE") testified. (Tr. 211-31.) At the time of the hearing, Plaintiff was 53-years old and had a high school education. (Tr. 215.) Plaintiff's past relevant work included a job as a LPN. (Tr. 215-16.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920.[2] If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient residual functional capacity, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

In his June 4, 2007, decision, the ALJ found that Plaintiff: (1) met the Act's insured status requirements; (2) had not engaged in substantial gainful activity since the alleged onset date; (3) had "severe" impairments consisting of bilateral breast cancer with bilateral radical mastectomy, chemotherapy, radiation therapy, Taxol treatment, and treatment for lymphedema; (4) did not have impairments meeting a Listing; (5) was not fully credible; (6) was unable to perform her past relevant work; (7) had the RFC for a wide range of light work that did not require overhead lifting; (8) was 53-years old with a high school education; (9) had no transferrable work skills; and (10) could perform other work in the national economy including work as a cashier. (Tr. 20-21.) Thus, at step 5, the ALJ held that Plaintiff was not disabled. (Tr. 21.)

On September 28, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 4-6.) Plaintiff then

---

[2]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence. *Id.*, § 404.1520(e). This RFC is then used by the ALJ in his analysis at Steps 4 or 5. *Id.*

filed her Complaint appealing that decision to this Court. (Docket entry #1.)

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #5), she argues that the ALJ erred: (1) in his RFC assessment; (2) in his credibility determination; (3) in discrediting Plaintiff's subjective complaints of pain; (4) in asking the VE an improper hypothetical question; and (5) in failing to find Plaintiff to be disabled pursuant to the Medical-Vocational Guidelines. Before addressing these arguments, the Court will review the pertinent administrative hearing testimony and relevant medical evidence.

**A.     Administrative Hearing Testimony And Medical Evidence**

Plaintiff testified that she had a mastectomy in 2002, and afterwards experienced pain and swelling in her left arm. (Tr. 216-17.) She had restricted movement of her left arm, which prevented her from doing any overhead work with that arm.[3] (Tr. 218-19.) This also made it difficult for her to lift. (Tr. 220.)          Plaintiff kept her arm elevated, and took BS powders, Motrin, herbal therapy, and massages for her arm. (Tr. 221.) She had to elevate her arm 3 to 4 times a day, and experienced pain if she did not elevate or massage her arm. (Tr. 221.) This also made her feel depressed and anxious. (Tr. 221-22.)

Melvin Moore, Plaintiff's husband, testified that her arm and fingers would swell and that she was not as active as she used to be. (Tr. 227-28.)

Plaintiff's medical records reflect that she had a right mastectomy in 1978. (Tr. 171.) On January 24, 2002, Plaintiff underwent a left modified radical mastectomy, following a diagnosis of Stage III advanced breast cancer with ulceration, including cancer in 4 axillary lymph nodes. (Tr. 173.) Following her surgery, Plaintiff was treated with a course of chemotherapy.

---

[3]Plaintiff is right-hand dominant. (Tr. 219.)

From February 13, 2002, through September 22, 2004, Plaintiff had regular follow-ups with Dr. Jack Sternberg at Arkansas Oncology Associates. Plaintiff's extremities were consistently noted to be without cyanosis, clubbing, or edema. (Tr. 157-72.) On February 21, 2002, Plaintiff reported no pain other than tenderness in the surgical area. (Tr. 170.) On March 14, 2002, Dr. Sternberg noted that Plaintiff had done "very, very well [o]utside of some emotional distress." (Tr. 169.) On April 4, 2002, Plaintiff reported no significant side effects from her chemotherapy. (Tr. 168.) On May 23, July 8, and August 5, 2002, Plaintiff was "asymptomatic." (Tr. 165-67.)

On September 4, 2002, Plaintiff developed a "little bit" of paresthesias in her fingertips. (Tr. 164.) On September 30, 2002, Dr. Sternberg referred Plaintiff for a comprehensive course of radiation therapy. (Tr. 163.) On October 17, 2002, Plaintiff underwent a course of radiation therapy, which she completed on December 2, 2002. (Tr. 187-90.)

On December 17, 2002, Plaintiff was seen by Dr. Reed Thompson for an evaluation of left upper extremity edema. (Tr. 132.) His examination revealed generalized edema, on Plaintiff's left side, from her wrist to her underarm. (Tr. 132.) Plaintiff did not have any pain, and she demonstrated normal grip strength and a full range of motion. (Tr. 132.) Dr. Thompson assessed Plaintiff as having "secondary lymphedema," and scheduled a venous duplex scan to rule out a deep venous thrombosis.

On January 1, 2003, Plaintiff returned to Dr. Sternberg and was noted to be doing "fabulously well" without any symptoms. (Tr. 162.) Dr. Sternberg assessed Plaintiff to be in complete clinical remission.[4] (Tr. 162.)

---

[4] Plaintiff was noted to be asymptomatic over multiple observational visits with Dr. Sternberg in 2003 and 2004. (Tr. 157-60.)

On January 9, 2003, Plaintiff underwent a venous duplex examination of her upper extremities, which was normal. (Tr. 128, 130.) Dr. Thompson then referred Plaintiff for manual lymphatic drainage ("MLD") therapy. (Tr. 128.)

On February 10, 2003, Plaintiff underwent an MLD therapy evaluation at UAMS. (Tr. 124.) Plaintiff's upper extremity range of motion was within normal limits. (Tr. 124.) On a scale from "0" (no pain) to "10" (severe pain), Plaintiff reported having a level of "2" pain in her left hand. (Tr. 124.) On a scale from "1" (needing total assistance) to "7" (complete independence), Plaintiff was assessed to have the following limitations in her activities of daily living: 7 - eating, 6 - grooming, 6 - upper extremity dressing, 7 - lower extremity dressing, 6 - bathing, 4 - home management, 7 - tub transfers, and 7 - toilet transfers. (Tr. 124.) Plaintiff's "work/leisure/community" activities were checked to be "limited" as a precaution, secondary to increased hand girth. (Tr. 124.) Plaintiff attended MLD therapy sessions on February 13, 17, and 21. (Tr. 119.)

On February 21, 2003, Plaintiff was discharged from therapy, with instructions to wear a compression garment at home. (Tr. 122-23.) Plaintiff was noted to have improved in response to treatment, and her edema had decreased 8 inches since February 10. (Tr. 123.) Plaintiff reported no pain, and her upper extremity range of motion was within functional limits. (Tr. 123.) Plaintiff's "work/leisure/community" activities were checked to have "improved," with increased grip and dexterity. (Tr 123.)

On December 14, 2004, radiologist Ray Harron conducted a "B-reading" of Plaintiff's chest x-ray at the request of a lawyer (not Plaintiff's lawyer in this case). Dr. Harron wrote that her x-ray revealed bilateral interstitial fibrosis consistent with asbestosis. (Tr. 146.) Based on a work history indicating Plaintiff's occupational exposure to asbestos in the late 1970's, Dr. Harron recommended

that Plaintiff be frequently examined by physicians.

On an undated checklist that was transmitted to the Commissioner on February 7, 2005, Dr. Sternberg checked that Plaintiff "is able to" sit, stand and move about, lift and carry, handle objects, reason, and make occupational, personal, or social adjustments. (Tr. 147.) In the comment section, Dr. Sternberg wrote "No disability I know of from her previous cancer. No therapy for over 2 years." (Tr. 147.)

On June 18, 2007, Plaintiff was seen by Dr. James Hogan at Arkansas Lymphedema & Therapy Providers, and was assessed to have a 16% increased edema in her left arm.[5] (Tr. 209.) Dr. Hogan noted that Plaintiff reported pain "due to decreased mobility and edema," and that Plaintiff was "unable to use left arm for functional activities such as washing and brushing hair." (Tr. 209.) Photographs of Plaintiff's arms reflect that her left arm was swollen in comparison to her right arm. (Tr. 209.) Dr. Hogan implemented a MLD therapy plan, including a compression wrapping, with a goal of reducing the edema in Plaintiff's arm by 10-15% withing 4-6 weeks. Plaintiff was also prescribed Propoxyphene for pain. (Tr. 210.)

## B. Plaintiff's Arguments Supporting Reversal Of The ALJ's Decision

### 1. The ALJ's RFC Assessment

Plaintiff contends that the ALJ erred in determining that her RFC allowed her to perform light work. According to Plaintiff, the swelling, pain, and restricted motion in her left arm, prevents

---

[5]Notably, this visit was approximately two weeks *after* the ALJ rendered his decision. However, the Appeals Council received this evidence and considered it in denying review. (Tr. 7.) Where the Appeals Council considers new evidence but declines to review a case, the Court is to include the new evidence in reviewing whether substantial evidence supports the ALJ's decision. *See Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir.1992); *compare with Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir.1994) (noting that this standard requires speculation "to some extent" on how the ALJ would have weighed the new evidence, "a peculiar task for a reviewing court").

her from doing the "frequent" lifting and carrying of objects required for light work.

While the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," a "claimant's residual functional capacity is a medical question." *See Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Some medical evidence must support the determination of a claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *See Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

Dr. Sternberg, the oncologist who consistently followed Plaintiff, opined that she could lift and carry, and he knew of no reason why she would be disabled. (Tr. 147.) The medical evidence establishes that Plaintiff developed edema in her left upper extremity, but there is nothing in the record suggesting that it limited Plaintiff to the degree she alleges. In 2003, when Plaintiff underwent MLD therapy, her edema responded well to therapy in a matter of weeks, and she was discharged with no pain, full range of motion, and increased grip and dexterity. While Plaintiff's edema returned in 2007, her MLD therapy plan accounted for a reduction in the edema and increased functionality in a period of weeks.

Finally, it is important to note that the ALJ's RFC accounted for limitations from her edema. The RFC for light work was more restrictive than the exertional requirements of Plaintiff's past relevant work as an LPN (which is classified as medium work), and the ALJ specifically precluded Plaintiff from any overhead work with her upper extremities. Thus, the Court concludes that the preceding medical evidence supports the ALJ's RFC determination.

### 2. The ALJ's Credibility Assessment

The Court will combine its discussion of Plaintiff's second and third arguments, which are

essentially identical. Plaintiff relies on the medical evidence confirming her diagnosis of lymphedema and accompanying swelling in her left arm to argue that the ALJ erred in discounting her credibility. Plaintiff characterizes her edema as "gradually increasing" since her surgery in January of 2002. (*Pltf's App. Br.* at 10.) She places particular emphasis on the June 18, 2007 record from Dr. Hogan reflecting that she was "unable to use left arm for functional activities such as washing and brushing hair." (Tr. 209.) Additionally, Dr. Hogan took photographs showing swelling in Plaintiff's left arm, and he prescribed Propoxyphene for pain.

In evaluating Plaintiff's credibility, the ALJ applied the *Polaski* factors[6] and took into account her daily activities, medications, precipitating and aggravating factors, and the medical record before deciding that her subjective complaints were not fully credible. (Tr. 16-17.) While Plaintiff contends that the medical evidence supported her testimony regarding the limitations in her daily activities, the weight of the evidence supports the opposite inference. Plaintiff reported virtually no symptoms or pain in the course of seeing her treating oncologist for over two years. Plaintiff reported having little pain when she first underwent MLD therapy in 2003, and she was discharged from therapy in a matter of weeks reporting no pain. While the therapist initially evaluated Plaintiff to be limited in her activities of daily living (as a precaution due to increased hand girth), she was discharged with a specific notation that her activities of daily living had improved with increased grip and dexterity. At the time of the administrative hearing, Plaintiff testified that she took over-the-counter medications for pain.

The report of Plaintiff's visit with Dr. Hogan, which occurred after the ALJ rendered his decision, arguably provides more support for Plaintiff's subjective complaints. For example, the

---

[6]*See Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

ALJ noted that Plaintiff did not take prescription medications for pain, but Dr. Hogan later prescribed pain pills for Plaintiff.  Nonetheless, the Court concludes that even had the ALJ been presented the report from Dr. Hogan, he would still have had an adequate evidentiary basis for discounting Plaintiff's credibility.  Importantly, Dr. Hogan implemented a MLD treatment plan of decreasing the volume of Plaintiff's left arm edema, with a goal of returning her to normal functionality with little or no pain, within 4-6 weeks. (Tr. 209.)  This closely approximates the same course of therapy that ended in a successful result for Plaintiff in 2003.  Thus, the Court considers it most unlikely that the ALJ would have reached a different decision concerning Plaintiff's credibility had he had the benefit of the report.

Plaintiff also points out that her husband testified that her activities had been limited, consistent with her own testimony. (*Pltf's App. Br.* at 10.)  However, the Eighth Circuit has held that an ALJ may properly discount a family member's testimony where he finds that it is in part motivated financially by the receipt of benefits.[7]  *See Buckner v. Apfel*, 213 F.3d 1006, 1013 (8 th Cir. 2000) (*citing Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993)).

### 3. The ALJ's Hypothetical Question To The VE

Plaintiff argues that the ALJ asked the VE a flawed hypothetical question because it assumed an RFC for light work that did not account for Plaintiff's pain, which would have eliminated her from the lifting requirements of light work.

This point for reversal is simply a corollary flowing from Plaintiff's previous arguments that the ALJ erred in discounting her credibility and assessing her as having the RFC to perform light

---

[7]The ALJ found that Mr. Moore's testimony was "based upon an uncritical acceptance of [Plaintiff's] complaints, and to some degree, is motivated by the desire to see her obtain benefits." (Tr. 19.)

work.  Because the Court has determined that those arguments have no merit, this point likewise has none.

### 4.      Plaintiff's Disability Status Under The Medical-Vocational Guidelines

Finally, Plaintiff argues that she should have been found disabled pursuant to the Medical-Vocational Guidelines.  She reasons that, if the ALJ had accepted her testimony regarding the weight she could lift, her RFC would have been consistent with sedentary work, not light work.  Combining a sedentary RFC with her age, education, and lack of transferable job skills, Plaintiff argues that the application of the Medical-Vocational Guidelines would have directed a finding of disability.

Like her previous argument, this point is premised on the ALJ having erroneously assessed her RFC and credibility.  For the same reasons stated earlier, the Court concludes that this argument has no merit.

### III.  Conclusion

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts his findings.  The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ.  *E.g., Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996); *Pratt v. Sullivan*, 956 F.2d 830, 833 (8th Cir. 1992).  The Court has reviewed the entire record, including the briefs, the ALJ's decision, and the transcript of the hearing.  The Court concludes that the record as a whole contains ample evidence that "a reasonable mind might accept as adequate to support [the] conclusion" of the ALJ in this case.  *Richardson v. Perales*, 402 U.S. at 401; *see also, Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).  The Court further concludes that the ALJ's decision is not based on legal error.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is affirmed and Plaintiff's Complaint is DISMISSED, WITH PREJUDICE.

DATED this 3rd day of December, 2008.

_____
UNITED STATES MAGISTRATE JUDGE